The case that we have this morning is 2022-30333, Robinson et al. v. Ardoin. Ardoin And we'd like to note that Judge King, as you may see from the screen, is fully participating in the argument remotely. Judge King, can you hear and see? Yes, but I do want to say that I don't have a list, as I would have if I were in New Orleans, of who's up and who's representing whom. So be sure when you get up you tell me who you represent, just in case I might not be able to tell from the argument. Hopefully I would. And Judge King, I can't really see you over the bench because I'm so short. So if you have a question or comment, I hope you will speak up to make sure you are recognized appropriately. And of course Judge Southwick is here in the courtroom, ready to go. We will have here for Mr. Chorchinsky, is that correct? You can come up. Hey, police and court, Your Honor. I'm Jason Chorchinsky of Baltimore Law School here today on behalf of Attorney General Jeff Landry, arguing Maybe move the microphone closer to you. Sure. Is that better? Yeah. My name is Jason Chorchinsky. I'm with the law firm of Holtz & Vogel, and I'm here representing Attorney General Landry. And with me is Phil Strack of Nelson Mons, and he's representing Secretary of State Kyle Ardoin. I'm going to take 10 minutes to address procedural issues. Mr. Strack is going to address what we view as the merits issues here. And then we'd like to reserve five minutes for rebuttal. This district court's order should be vacated by this time. First, the injunction and the immediate harm that the injunction was meant to protect against has passed. The Supreme Court has issued two intervening opinions that the district court has not had a chance to consider, namely the Allen v. Milligan case and students for fair admissions versus Harvard. And let me ask you about the recent yesterday decision in the 11th Circuit three judge panel, Alabama three judge panel. It seems to me we stand in the shoes of the Supreme Court and Allen. They took the case, decided it on the merits. Chief Justice Roberts said that the district judge or panel in that case, two different cases, made a proper decision on the P.I., playing it reasonably likely to succeed on a Section 2 claim. But then he later says, majority, that the Section 2 claim had actually been proven. So on remand, you know what happened. They proceeded on that basis without having a new trial, giving the legislature a chance to rule. They came up with a new district that gets ruled on by the three judge panel. And off we go. Why isn't that the way to proceed here if if we decide that Chief Judge Dick made the appropriate decision? Your Honor, I think that the answer is that Alabama and Louisiana are just factually differently situated. And as the court made clear in Allen, Section 2 requires an intensely vocal appraisal. Mr. Shrack is going to address more than that. The mandamus panel and your mandamus brief as well as your stay brief make this issue that the Chief Judge Dick didn't give the state enough time to prepare its case. You've got some support from the mandamus panel saying that her decision was tentative. But I don't see that argument in what you have presented to us. You are just arguing that she erred. Chief Judge Dick erred in her conclusions, not that you didn't have enough time. What would what would another hearing do that you didn't have an opportunity to deal with in whatever it was in 2022? Your Honor, I think a couple of things. One, in 2022, we had about three weeks to prepare for the preliminary injunction. That is the issue that you haven't raised with this, though. In any of the briefing to this panel, it is in motion and petition for mandamus and then the motion for stay. Now, you know this case frontwards and backwards, but I don't think it's in the briefs to us. Your Honor, I don't think that we raised that. The timing, the pre-preliminary injunction issue. The timing of this timing is the inadequacy of your opportunity to present a case. And that's a significant argument, but I don't see it. Your Honor, I mean, I do think that is a significant argument. We, you know, we proceeded on the schedule that the district court presented us with. And we put forward the best evidence we could in the rush period of time that we had to care for it. Hold on just one second. All cell phones must remain off in the courtroom. Thank you. You know, and that's why we think the preliminary injunction order should be vacated. We should have an opportunity to go through the traditional trial process and have this case heard at a full trial on the merits, rather than the rush and abbreviated process subject to lightened evidentiary burdens and lightened evidentiary rules that we had before the preliminary injunction. This was a mandatory injunction. You certainly write a P.I., usually holds the status quo until you have a merits decision. But this is a mandatory injunction that says do this. And if it had been done, there would not be any trial on the merits if the legislature had acted back then. I'm not going to get into whether they had time to act and whatever. But it does seem to me that this procedure, just as in Allen, the Alabama case, is not envisioned to be a separate trial. I mean, help me with that. Is there a case law other than generally on injunctions? It would say you would have, after a decision such as made in Allen and made in this case, still another hearing? Your Honor, I think the reason that liability and remedy are often bifurcated in Section 2 cases is because the Supreme Court has told us in Upham v. Seaman and a whole line of cases that should the federal court find liability, the state has to have the first opportunity to remedy it because of the nature of the law. That's what happened in Allen on the remand. They gave the state an opportunity, but there was then not a new trial to see if there was a violation. Well, that's correct, Your Honor, and I think the state objected to that. And I don't know if the state's going to be appealing there in the ordinary course, but the state also in Alabama made clear that they're looking forward to a trial on the merits. I don't know how soon that will be scheduled, but that was just a preliminary proceeding and the new map is in place for 2024 that the court ordered yesterday. So are you asking us to, because it's your position that under the Winter case that this was just preliminary and that you should have the full trial on the merits, you're asking us to send it back for the full trial on the merits? Is that correct? That's correct. And would, with instructions, that it be done before the end of the year so that it could make the 24 election? Your Honor, I think this court obviously could direct the district court to act in one way or another, or the court could just vacate it and leave it to the discretion of the district court to figure out the next proceedings. In fact, the district court has already scheduled a status conference for October 17th. Right, but if we were concerned that it needed to be done so that the people have waited a long time, that they get it done before the end of the year so that if there was an appeals process, it could play out in time for the election. Your Honor. When would the proceeding need to be done in order for the election to take place? Your Honor, I think there is some discretion there. I mean, in the state legislative case that is sort of running in parallel with this in front of the same district court, in July the court scheduled a trial for November for elections that aren't happening again until 2027. That was four months from the date of the order to the trial. I think early next year, I think, would be a reasonable time for it. You mean January? No, but the trial this year, but January, February, when would everything have to be wrapped up? Your Honor, the qualifying deadlines for the 2024 election are in July, and the Secretary needs some time in advance of that to, if there's going to be a different map that is in place right now, the Secretary does need time to do the mechanics of reassigning voters. Is that four to six weeks? Probably something like that, although Mr. Chirac is representing Secretary Ardoin, and perhaps I'll let him address that. Ben, I have a follow-up question. You were talking quite a bit with Judge Southwick about the three weeks that the trial, whether or not there was enough time for the preliminary injunction hearing, whether you had raised that in the briefing. I thought that what was being challenged is that there shouldn't also be, that the state didn't have enough time with the five days. Is that part of the case here with the five days to say, are you going to draw a new map or not? And that was all very, it was compressed time because the 22 election was imminent. So is that what you're challenging here? Are you challenging both, and did you raise that in the briefs? I think we're challenging both the process and merits here. Mr. Strack will address the merits issues that we have with what the district court did. But are you challenging that part of the process, the five days to draw your new maps? Your Honor, I think that, just like this injunction, I think that issue has sort of passed because the Supreme Court issued the stay and the granted cert before judges. Well, do you think you should still have a chance to draw, the state should have a chance to draw maps as is the normal custom and legal approach in these cases or not? Well, yes, if this court were to affirm the preliminary injunction and conclude that the district court was likely correct, then yes, it would make sense for the legislature to have a real fulsome opportunity to do this. I mean, Your Honor, we're dealing with, you know, a state that has new legislative elections literally a week from tomorrow. Have you argued that? We certainly... Have you argued that in the mandamus but not here? We certainly argued that in the mandamus petition because of the compressed time frame, in particular leading up to the judges of the medium period. Well, the mandamus, just because Chief Judge Dick was starting to have a trial and preparations for a trial, which was moving beyond what the PI had already done, essentially teeing it up as soon as it made to what Alabama had done, which is somewhat... I think... ...made time schedule. So it wasn't, it seems to me, anything relevant to what we are looking at now on whether the initial decision, that mandamus, doesn't have anything to do with whether the initial decision was correct. That's correct, and the mandamus panel itself disclaimed any... speaking to any merits of the trial judge's preliminary injunction opinion. But she wasn't proceeding to have a trial. That is correct. That's not accurate, was it? She was proceeding to have a hearing to determine what the shape of the map should be. The map that the federal court was prepared to propose, correct? Correct. It was not a trial on the merits to go back and say, can you establish all the evidence? It was just so that it was to... I believe that in the district court's approach, that time for the state to draw the maps had already passed. Is that correct? That is the way I believe the district court proceeded, yes. And that she was just proceeding with the actual remedy hearing where she was going to hear a presentation from the court. And then the court was going to determine what the map should be. Yes. That was the only thing that was being tried in that proceeding. Right, that was the subject of that hearing. I wouldn't have even thought about a trial. Yes. Is that actually what Chief Judge Dick... I didn't mean to suggest it would be a trial on the merits. I think certainly Chief Judge Dick thinks she's done that. At least she's had the hearing and decided this violation has occurred. But whether it be a trial or whether it be an evidentiary hearing or whether it be something else, there's still more work to be done even on the Chief Judge Dick's viewpoint. So when you say what was going to take place at that hearing and what was going to happen thereafter, isn't part of that what had been decided at the hearing, what was going to be done and what has to be done thereafter? As she already said, what you would say is the road map. It's our understanding, based on the pre-trial conferences, the pre-hearing conferences that we had with Judge Dick and the status conferences that occurred over the summer, it is our understanding that the district court intended the originally scheduled October 3rd through 5th hearing to be what was referred to as a remedial hearing where at the conclusion of that hearing, the district court would then impose a map on the state of Louisiana for the 2024 congressional districts, which again left us without an opportunity to have a trial on the merits before the 2024 election. And I see that my... Your time has expired. And in fact, we have gone over with you. And so we will certainly give... Is it Mr. Nyssa? Nyssa. Nyssa. Two extra minutes to compensate so that we're trying to give everybody the same amount of time the best we can. Thank you, Your Honor. May it please the Court. Good morning. Can you hear me okay? Your Honors, I'm Phil Strack with the Nelson Mullins firm here for Secretary of State. I'm primarily here to address the substance of the district court's opinion as it relates to primarily the Jingles preconditions because that's what these cases are usually all about. As it relates to the Jingles 1 precondition, the U.S. Supreme Court in Allen recently reiterated that Jingles 1 is satisfied with, one, a reasonably configured district that is around, two, a geographically compact minority population. The district court focused primarily on the configuration of the district and not the compactness of the population in attempting to force proportional representation on the state. The district court focused on statewide measures of compactness. This is what the court said. The court said, quote, the fact that plaintiffs' illustrative maps feature districts with 50% plus BVAM while scoring well on statistical measures of compactness is the best evidence of compactness. That was criticized by a state panel of this court last year, that analysis. The panel was clear, and we think it was correct, that as it relates to compactness, it's the compactness of the population that's important, not just the district. So in this case, the plaintiffs never really grappled with or put on evidence regarding population compactness. They put on plenty of evidence about the district, but not the population. Did they put on evidence compactness district by district as was required by the Wisconsin Legislature of the Wisconsin Elections Commission? I believe they put on statewide measures of compactness. Isn't it required to be district by district? It is. It is. And not only is it supposed to be district by district, but that would also apply to the population compactness of the district that they're trying to force the state to be imposed upon. Did the Secretary of State or some other person on behalf of Louisiana argue that the illustrative maps had a failing with regard to the, for lack of a better word, Cajun country? That's in the briefs here. That was another group that was going to be displaced as a result of that approach. I believe so, Your Honor, but what the Secretary and the other defendants focused on was, as it relates to population compactness, what the illustrative maps do is try to stitch together disparate black populations across the state of Louisiana. And so they do that by forming an anchor in East Baton Rouge and then going up to the northern Delta parishes. And what we said was what they were effectively doing is they were trying to connect pockets of black communities hundreds of miles apart using whole parishes as white land bridges to connect those black populations. And under LULAC, Millery, Georgia, I mean, that's just an inappropriate way to... How is it different than what was done in the Alabama case? So in the Alabama case, interestingly, the court, the U.S. Supreme Court, found that there were two communities, one being the Black Belt, which has nothing to do with race. It has to do with the soil. So there was really no argument, and certainly no argument made, like we have here, that the court was trying to stitch together disparate black populations and form a community of interest based on skin color as opposed to some other neutral factor. What they tried to do here, through their expert, Mr. Anthony Fairfax, was they tried to say, well, socioeconomic factors make this a compact population, but that's been wrong. Because when you analyze Mr. Fairfax's report, what you find is that he would combine this East Baton Rouge population with the Delta population. But his own report and his own testimony admitted that the Delta is not part of... East Baton Rouge isn't part of the Delta. It's not the same community. He also tried to say, connect them through economic factors like income levels, education, but the problem is his report and his testimony conceded that the income and education levels are much higher in East Baton Rouge than they are up in the Delta region. There is no commonality between these populations other than skin color. We do look at... I'm sorry, Presiding Judge, go ahead. Go ahead. We do look at Chief Judge Dick's fact-finding from clear error, correct? I don't know if I gave you a chance to answer that. Correct. I don't want to move ahead too quickly. It seems to me, in more than one place in her 100-plus page opinion, she says she wasn't sure what community of interest really means. But, and also in the Supreme Court opinion in Allen, they said you could look at a community of interest just on the Gulf Coast County, Mobile, and whatever else is down there, or it could be split in other ways, as it was, in the proposed districts by the plaintiffs in Allen. So it seems to me even the Supreme Court recognizes community of interest is a flexible concept that can focus on different factors depending on what seems to be predominant, I think, outside the record. But the same sort of district was created in Mississippi, the Delta with part of West Jackson, which is majority black, an urban area. And so it's not unheard of. Maybe it shouldn't be done, but it wasn't forced by court. It was done by the legislature. So it seems to me community of interest is flexible. Why is the community you want us to focus on right, and what Chief Judge Dick did is wrong by clear error standards? Well, Your Honor, I would respectfully disagree that it's a clear error issue. She made a, the district court made a legal mistake in applying the population compactus requirement of Genes 1. That's a separate question, it seems to me. I'm looking at what is the right community to be looking at. Is it socioeconomic? Is it something else? And it seems to me that she made at least some findings that this was the right way that would join the districts and parishes that she joined would satisfy community of interest. Well, the only evidence that was in the record that the court heard a lot of it was from one witness from the plaintiffs who gave very vague testimony about the community of interest being faith, family, and culture, which is very vague. And they had another witness who actually contradicted that and said that the community, the shared community was Baton Rouge and South Louisiana, not Northeast Louisiana. So the evidence from the plaintiffs canceled themselves out. And then we had evidence from Senator Hewitt in the legislative record that talked about what the community of interest in the enacted CD5 was. So to the extent the burden here was on the plaintiffs, and it was, to demonstrate some community that gathered together these black populations other than skin color, which is not appropriate, they didn't do it. And the burden's not on us to demonstrate what the community is. What we've shown in our papers is that they stitched together these black communities based on skin color, and there is no other explanation for, at least none that's in the preliminary injunction record from here. Let me ask you another question about your arguments about precondition number one. As I read the brief, I remember the opening of the reply, the argument seems to be that the maps were shown, the illustrative maps were used to show that precondition one could be satisfied. And the argument seems to be in the briefs that race predominated in those maps. That was the goal. Is that a fair assessment, that that's one of the reasons the illustrative maps prepared by the plaintiffs are improper evidence? Your Honor, I can find a point on that. It's very easy to mix and match and confuse racial gerrymandering concepts with jingles one. I'm not talking about racial gerrymandering today. I'm not talking about racial predominance. I'm talking about jingles one, the population from taxes requirement and how the U.S. Supreme Court has applied that requirement. Your Honor mentioned about the illustrative maps. There's a numerosity requirement that's also a part of jingles one. It says it's gotta be 50% plus one D map. And they claim to have done that. We've talked about that in the briefs. I'm not here to really talk about that unless you have questions. I'm focused on did they prove that the population of their lesser district was compact? And we believe that under LULAC, the Miller case, a case from this court that, let me find it. It's Sinsley versus Allbritton 385 at 3rd 591. We believe that those cases clearly demonstrate that they stitched together disparate black populations much like what was done in those cases. In the Sinsley case, the court upheld a district court that said it was not a compact population to stitch together splits of two majority black towns approximately 18 miles apart with a narrow strip of land. This court said that that one failed the population from taxes requirement. So the legal mistake is what precisely? I'm sorry, Your Honor. What is the legal mistake precisely? That the court approved or allowed the plans to use the lesser districts that did not contain a geographically compact population to demonstrate a violation in an active manner. That was a legal error. Is it a legal error to move people between 5 and 2? Or is that just a factual argument? Well, so that's interesting because what they did in the lesser advance, and I think that certainly could be part of the legal error. They moved voters out of East Baton Rouge that were in a majority black district already, CD2. And they sliced them out of CD2 where they were already in a performing district, and then sliced them out and put them in their illustrative district, which when I get to James 3, we'll talk about that. So part of, and their expert admitted that you can't draw that second majority black district without East Baton Rouge. That's why they did that. They had to have that population. Then they got it connected with something, and so the only way you could do it in Louisiana is to try to reach up to the delta and connect disparate pockets of black population. But isn't part of the proper principles here that we have to apply? Alan, certainly just as Kevin all talked about, he particularly liked the phrase pack and crack population. And that's what it seems to me would apply to what you just said, that if you put all the black population in one particular district and keep it from being another district and influencing it, that's the era of packing minority population. So I'm not saying that the answer is whether you're right or wrong, but it does seem to me that your statement that that's what the illustrative district did is not really undermining the illustrative district. So long as there's community of interest and you satisfy the redistricting factors and whatever else, which you said it does not. Right, and that's the problem. Their illustrative district has to combine 50% plus one with a geographic compact. That's just what they didn't do here. They stitched together populations a la Blue Lac in Miller v. Georgia, and they did it only on the basis of skin color. Did you have something on Jingles 3 or something that you alluded to? We do. And just very briefly, the experts admitted, the plans experts admitted that that their illustrative districts would perform even if the district was less than 50% BVAP. And so we believe that as a result, that testimony demonstrated that no VRA remedy is even required in the area of the state that they're trying to create this new 50% district. And it makes sense in light of the lack of compactness of the black population. As I mentioned, they had to take black population out of East Baton Rouge, lock it off, put it in this new illustrative district, but East Baton Rouge shares nothing in common with the Delta region that was solely done to create a district based on skin color. So as the state panel noted, and you alluded to, a lot of those East Baton Rouge voters were already in CD2, which was already a performing district. So now they've been chopped out of there just to create a new district. Let me ask you something about the Allen opinion. The briefing talks about Chief Justice Roberts not having a majority for all of it. What is the significance, in your view, of Justice Kavanaugh not joining Section 3B1? Is there anything in there, in Chief Justice Roberts' opinion, 3B1, 2, whatever it was. I forget now. Maybe it was 3B2, that's relevant to this case in that perhaps your friends on the other side are relying on that they shouldn't be. I think it's a great question. I took it that Justice Kavanaugh was uncomfortable with the Chief Justice's discussion of racial predominance, which is racial consciousness and redistricting. And I also think that Justice Kavanaugh, more relevant in this case, is hyper-focused on population compactness. And he talked about that in his concurring opinion. He joins everything in full except for that section. Right, exactly. Regardless of further articulation, he's joining everything the Chief said in full with one exception. Correct. But the relevance of that is Justice Kavanaugh is looking at this population compactness as a way to rein in drawing districts based on skin color. And the Chief Justice was not focused on that. And I think Justice Kavanaugh wanted to be focused on that, and I think he'll be focused on that in the future, and I think he'll be focused on that in this case. Have you fully opened? Yes. Thank you. Good morning, Your Honors. I just want to point out that I am dividing time with Ms. Kavanaugh, who represents the Gammon plaintiffs. I'm Stuart Nafee, and I represent the Robinson plaintiffs, and I'm from the NAACP Legal Defense and Education Fund, and may it please the Court. Well, if we behave ourselves, do you want us to limit our questions to one particular issue and she covers the rest, or are you fair game? I think we're both fair game. Whatever questions you've got, I'll try to answer them. Do we have... Is there standing because the NAACP has people throughout all the districts? There is standing because the NAACP has members throughout the state, including in all of the districts at issue in this case, and we have individual plaintiffs in most of the districts in the state, and certainly the ones that are... They're not in all of them. We have individual plaintiffs in District 5 who would be drawn into a new majority-minority district. We have individual plaintiffs in Baton Rouge who would be drawn into an unpacked district, so they're currently in a packed district, which the Supreme Court has recognized as an injury. And we have plaintiffs in St. Landry, Paris, that would be drawn into a new majority-black district, which is, I believe, in District 3 under the enacted map. So we have individual plaintiffs, I believe, in every district that would be drawn, that would be used in part to create the new majority-black district that our illustrative plans create. Given that this was preliminary and this was designed for the 2022 election, why shouldn't we remand and, say, have a trial really quickly by the end of the year so that if there is an error with the state's plan, which there's a preliminary injunction that says it is, this can be tried on the merits and with the actual maps rather than having a whole... some map here, some map there, and... Your Honor, it's far from clear that there could be a trial on the merits and have everything wrapped up, as I think Judge Southwick put it, sufficiently in advance of the 2024 election. Why couldn't that be ordered by us? Well, Your Honors could order a trial... By the end of the year. By the end of the year. So wrap up a trial by the end of the year. And then there would need to be a remedial process, which the state has said... And that that needs to be done by the end of January. And that, you know, we have these expedited appeals that we have now in our emergency docket where we can hear you in two or three weeks. So, and then it would just be up to the Supreme Court and... Well, I think, Your Honor, there is no reason that all that can't happen while a preliminary injunction is in place. But then we have multiple iterations, and so the people would have one map here and then a different map in 24. If you were... That's assuming you prevailed today. They'd have a different map 24, and then they'd have a different map 26. So they would constantly be in flux. Well, if a trial could be held sufficiently in advance of 2024, there would be no reason... You know, this interim map that we are asking the district judge to impose and we're asking this court to affirm the district judge's injunction, if there has been a trial sufficiently ahead of 2024, that interim map may never be used. Why couldn't we order that to make sure? Well, I think you can order the district judge to pull the trial. I think it is far from clear that all of that will be done and all appeals resolved, and a new map and the legislature given a chance to draw a new map, whatever litigation there may be around that new map, as there was in Alabama, and then whatever process the district court imposes to enact a final map, that that could happen. If the state... If the state just, you know, I think Judge Southwick asked them point blank, when is the date by which a new map would need to be in place, then they will not answer that question. They have not answered that question. Okay. I thought I asked that. I said, when is it? Is it six weeks before the date of the July? I give her full credit. That's right. I apologize. You asked it from a different direction, not the date point. Looking at what happened in Alabama yesterday, as to that map, and the question I asked your friend on the other side about why doesn't what we do here need to mirror, at least consider mirroring what happened in Alabama. I looked at the briefing in the Supreme Court by Alabama. Neither in the opening nor the closing brief did they make any kind of argument about there needing to be a trial, as is being suggested here, that the P.I. was not enough. Part of it is that the briefing was leading up to 2022. The briefing was still in advance of the election, and whatever other components there may be to that. But the briefing didn't suggest anything, and Chief Justice Roberts' failure to suggest anything is the norm when something's not briefed. Is this really the same situation as Alabama? Since the issue has been raised, and you can argue it's not been properly raised, I have some questions about the argument now that there were defects in how rushed the hearing was. So what's your best presentation on why we should follow this process of saying the P.I. is enough? We're now just, if we uphold it, sustain it, affirm it. And the next stage is maybe give the legislature another chance, but then having a map determined by the district judge as happened in Alabama, if the legislature doesn't react in a way that is considered by that judge to be appropriate. Your Honor, there is one, I think, relevant difference in Alabama, which is that in Alabama, the district court asked the state, when do we need, if we, you know, if the court is going to impose a map, when do we need to do that? On remand, and the state gave them an answer, which the state here has not done. The state there said it would need to be in place by early October. That is what the district court worked towards, and that is what they have now done. Are you suggesting we ask the state that? I would suggest that... The legislature, state, somebody? Absolutely. Any of the parties on the other side, I think, could answer that question. The other difference is that there, the state asked for an opportunity for the legislature to enact a map. Here, the state has never made that request. They did not ask for that in the mandamus. That is what the motions panel provided, but the state didn't ask for that. They asked for the trial. I mean, until the Supreme Court ruled, they were still contesting there would need to be... It was on remand they asked for that. We don't have a final approval, as it was in Alabama, and it wouldn't happen until this court were we to affirm, which remains to be seen. Absolutely. Although this court did not grant the stay of the remedial proceedings that the state asked for and so the district court was at liberty to move forward with a remedial map. And on remand from the Supreme Court, they've had over 90 days at this point to ask to enact a map. They didn't actually even need to ask the district court's permission, and they have made no move towards enacting a remedial map. But should they have been making a move? Because they want to... They think they can win here today, so they want to wait and see if they win here today, and then they want to have a chance to draw their own map. Isn't that logical and appropriate, given the fact that we have so much time now before the 24 election, for them to have more than five days to draw a remedial map and that the court shouldn't be drawing its own map until they have that chance? They may flub it up and not do it if they have 30 days or something, but shouldn't, in normal due process, they have that opportunity under the case law in this area? Your Honor, we have no objection to this court on remand providing an opportunity for the legislature to enact a map that remedies the Section 2 violations, assuming this court affirms. Rather than the court starting out. Absolutely, Your Honor, we have no objection to that. The state has every right to do that. It is the province of the legislature to do redistricting, and we certainly have no objection to that if that is something that they want. Our concern is that they have used that as a delay tactic to push us towards the point where it may be too late to impose a new map. But if they want that opportunity, we certainly have no objection. Well, they don't want the opportunity  Of course. Okay. Okay, now, you know, as the motions panel explained, and we're not bound by the motions panel, and the motion panel did recognize there were significant weaknesses in the analysis, but as it explained, compactness is to be evaluated district by district, and it does not appear to me in this record that compactness was analyzed district by district. Could you help with that? Absolutely, Your Honor. Compactness was analyzed district by district, and on a plan-wide level. The district court included the geographic compactness scores for the two majority black districts, in her opinion, that were excerpted from Mr. Cooper's expert report that was submitted in the district court. Perhaps at the beginning of her opinion. Is that where this data is, in her opinion? Yes, it's in a chart that she's included in her opinion that's listed under the enacted plan under each of Mr. Cooper's illustrative plans. It lists the compactness scores. I would also like to correct... Let me ask you before you leave that, with fairness to counsel on the other side, I assume they're not making that up. What is the argument that that's not sufficient? Would you say there's any sort of defect in the way Chief Judge Dick did it that would support the argument that it's not there at all? No, Your Honor. I think she clearly had reviewed the evidence. There was no argument from the other side. They had put on no evidence that the districts were not compact. She found that the evidence presented by plaintiffs on compactness and on all of the traditional redistricting principles was essentially unrebutted. I don't understand that, because it is a... The district court's opinion did not seem to talk about the legislative process that had occurred before the trial. It seemed to just only... And it's mentioned in the brief that it was just witnesses at the trial and they failed to call their witnesses, and we don't know... I'm curious, but I don't know why they didn't call their witnesses. But there was evidence already in the record that doesn't really seem to be discussed in the opinion. There was evidence in the record by one of the legislators who explained at the beginning of each of the roadshow hearings, and the roadshow hearings are the public hearings that the legislature held to collect public input prior to engaging in redistricting. At the beginning of each of those, there was a presentation of the proposed map, the legislature's proposed map, that explained here's why we've configured it the way we've configured it. There is nothing in there that suggests that East Baton Rouge and the Delta don't share interests. There is an explanation that, you know, we've drawn District 5 as a rural district. As the Supreme Court recognized in Milligan, there may be conflicts between preserving different communities of interest, but illustrative maps preserve one. As the District Court found, she found that we have drawn together a community of interest that is divided in the state's map, and that sometimes means other communities of interest will be divided. The District Court did address that testimony. In any event, there is a discussion in the expert report of Dr. Tracy Birch one of the plaintiff's Senate factors experts of all of the explanations that the legislature offered at various points for why it was adopting its map as opposed to one of the other maps that had been introduced during the legislative proceedings that included the second majority black district. And the District Court addressed that information as part of her tenuous analysis. She found all of those explanations tenuous based on the testimony of Dr. Birch. Okay, let me ask you about Cooper, the North Carolina case. I guess I think the district was in Barbell, whatever. Some strangely shaped district. I'm trying to make sure that this isn't a racial gerrymander case. It seems to me the district that you... that the District Court was at least considering without having imposed it certainly at this point does join, as you know, East Baton Rouge all the way up to the Arkansas boundary, I guess, and the Mississippi River on the east all the way up as far as it goes. I don't know if that's an unusually shaped district. But what should it be looking at? It seems to me community of interest is at least part of what has to be shown. I don't know if there's any particular argument as to breaking down the boundaries, whether it's parish boundaries or otherwise. But I am troubled that that district, it's not... I may be confusing my cases. Maybe North Carolina wasn't in Barbell, but it's not as exotic, tentacle-strewn across the state district. But it is an unusual district. Joining an urban area with a very different area. Help me with that. Well, Your Honor, I would say it's not an unusual district. The district at issue in Milligan was very similar. It joined an urban area in Mobile with a very rural black belt. So our district is similar in that sense. It connects the East Baton Rouge with the Delta. And it doesn't only, as the defendant suggested... Split Mobile minority versus white population  The district court did not address how Mobile was split. It did address whether there was a community of interest between the parts of Mobile County that were drawn together with the black belt and found that there was. The way that Baton Rouge is divided in the illustrative plan is the way that Baton Rouge is divided in the state's plan. So we have not significantly altered the division of the city of Baton Rouge. And in fact, we have included much more of East Baton Rouge Parish in our new district so that we're not carving out solely the northern part of the city, but we are including the entire northern half of the parish with a district that extends north. So we're making a much more compact district. East Baton Rouge in HB1 is part of District 2, right? Yes, Your Honor. What's your point again about... That the parts of East Baton Rouge that are carved into... Separated from the rest of Baton Rouge. We have drawn the line essentially the same way in the illustrative plans. And there was evidence that there are shared interests between the population in East Baton Rouge and the Delta such that they form a community of interest such that they would... Redrawing the district in the way that we have done would provide an opportunity for a cohesive black population to elect their candidates of choice. And the district, contrary to what the other side has suggested, does not extend to pick up isolated pockets of the black population in the Delta. It includes most of the Delta parishes and includes the black population throughout the Delta in a new majority black district with East Baton Rouge. All right, Counselor. Could you address winter and whether the... Even if it's not moot, would the irreparable harm and equities balance be different now because we could order this be done in time? It's a similar question to what we were asking at the beginning, but this puts a finer point on it. Yeah, Your Honor, I think that the irreparable harm remains. The district court recognized that if there is an election under the enacted map in 2022, the harm would continue to 2024. But we could assure that by saying we are going to order that this be done timely and give deadlines. With respect, Your Honor, I think you can order the district judge to hold a trial. I think guaranteeing that there will be no irreparable harm in 2024 is a much more difficult proposition. And the whole point of the preliminary injunction is to ensure that there is an interim remedy in place while the case proceeds to trial. There is no reason that those two things can't coexist, that there can be an interim... What about the winter case that's cited by opposing counsel? Can you address that case? It's said that the irreparable harm is over at that point because you can move on with the case. I think there is a factual question of whether the irreparable harm is over because the state has not agreed that there is any date by which a new map must be in place in order to prevent Purcell from creating problems for implementation of a remedial map, whether that's after trial or as the result of a preliminary injunction. Thank you. Thank you very much. We will hear from your colleague, Ms. Conner. Thank you, Your Honors. May it please the Court, Avakana on behalf of the Gannon plaintiffs. I'd like to emphasize, I think a lot of the quick questions that have been discussed today are actually answered in the course of the Alabama litigation. As counsel of record in the Alabama litigation as well, I think I can probably explain how both on the substance and on the procedure, the Alabama case should inform of what's happening here. And it's important to note that before Alabama, the Supreme Court decision came down, the defendants here told this court, came to this court for a recourse from the district court's order, saying that the Alabama case was dispositive of this one, that the legal issues were identical and the factual issues were essentially the same. They were talking about the legal issues because they thought that they were going to be told you couldn't use race because the Supreme Court had spoken very strongly in other contexts that you couldn't use race. And they weren't told that. So that was the legal issue they thought was the same and they thought that issue would be decided in their favor and it was not. So I don't think they said that the entire case's procedural history is exactly the same. I thought they just meant that issue and they were wrong what the Supreme Court would do. Well, yes, certainly they were wrong and we don't have to keep them at their word. We can just look objectively at the case. So let's look on the substance of the cases. There's some very obvious parallels here. In both cases, Bill Cooper was tasked with determining whether there is a sufficiently large and geographically compact black population to draw an additional majority black district. In both cases, the fact finders, the district court, found him to be credible in that race did not predominate and that he balanced a host of traditional districting principles. I know you're trying to go through a list of things. Maybe you can stay on track. Let me ask you, as you've mentioned different things, what can we rely on in this record? Chief Justice Roberts pointed to some testimony in his opinion about why he concluded that race did not predominate in the creation of those maps. I think he acknowledged, though, that race was the goal in those maps and it's sort of a matter of whether the first precondition, how you interpret it. What can you identify in this record to support that race did not predominate in the creation of this district that you think would tie East Baton Rouge up with the Delta parishes? And is that just a matter of, again, as I was speaking to another counsel, just a matter of us deciding whether Chief Judge Dick was clearly erroneous in accepting that? Well, certainly the factual findings that Chief Judge Dick made about the reasonable configuration of the district are subject to clear error, and even her ultimate conclusion of vote dilution is subject to clear error because in the Section 2 context, the localized appraisals of the district's judges are given ultimate deference. But she did say in her opinion that race did not predominate, and she talked about some things in the record. It's worrisome to me, even in the Allen versus Milligan, that if the expert says the right thing and the district court accepts it, off we go. And it does seem to me the goal of these maps is very much focused on race, so I don't know where the line is. Yeah, let me provide Your Honor with some comfort on that. That's basically, you said, where in the record should we find that? And certainly the credibility of the expert drawing the map from the considerations that he took into consideration, that is absolutely within the purview of the district court to determine that he was, in fact, credible, and that's what she found here. But if we go more to the actual evidence, Your Honor is asked whether or not there is district-specific evidence. As my colleague mentioned, yes, the district court specifically noted on ROA 6661 the specific individual... I don't know what ROA is. Sorry, that is the district court's opinion, where it specifically charts out from Mr. Cooper's plan the individual district compactness scores as a quantitative measure in the exhibits to Mr. Cooper's plan at ROA 1277 to 1286. This is our expert report's plan. She specifically notes the compactness scores of each individual district in the enacted map and the illustrative map. And so, as a quantitative matter, we have shown compactness. But that's not all. Of course, as the motion panel of this court found, as a visible, when you're looking... Exactly. Not the mandamus panel, but the motion panel that was... No, I appreciate the clarification. And there the court said, well, just looking at the eyeball test, if you look at enacted 5 versus illustrative 5, these are very similar districts on a district-specific level. But we're not, we don't consider that, do we? Absolutely, the court's absolutely... No, no, no, I mean, we don't consider what the motions panel said. The Newby case says we're not bound, we do our own thing. They gave many caveats that they were under intense pressure and weren't sure. And they also had a very different standard of review because the other side was trying to get a stay, which is a higher burden than the standard here. Absolutely, Your Honor. You're not bound at all by the motions panel, but the evidence that was relied upon is certainly something that this court can look to. Okay. It has the quantitative evidence and the qualitative evidence. And I think the third point, which I imagine is where the nut of the matter is, is this cultural compactness question about how do you justify Baton Rouge with the Delta Parishes? And there, too, the record evidence is very clear. We had what the motions panel called extensive lay witness testimony explaining the cultural connections historically and educationally between the Delta Parishes and Baton Rouge. We have our own fact witness, Chris Tyson, who was a civic leader in Baton Rouge who ran for statewide office and who spoke about the... He said, Louisiana's black history flows through the Delta. He talked about the migration of the families and how that... I guess it's the nature of judges to interrupt. I'm sorry. But it seems to me one of my problems with the evidence you're talking about is that the district court's opinion talked about how little evidence there was from the state. But their argument, at least in the state panel and to the mandamus panel, is that they were rushed. They didn't have enough time to gather their evidence. What they introduced was from the roadshow, I think, the standard from what I just heard, the standard opening that one particular senator gave perhaps. What do we do with that argument? I don't think... It does seem to me that if the district court did not have sufficient time to, in part, introduce this case, that's problematic. The issue has to be raised. But nonetheless, what's your reaction to the argument that the shortcomings of evidence that there are, there was, in part, suggests they didn't have enough time to put the evidence in? I have several points, Your Honor. The district court gave a month between the preliminary injunction motions and the hearings. So they had a month to prepare. Yes, one month to prepare. In that month, they managed to secure eight expert witnesses' reports, seven of which they put on the trial.  and they chose not to put him on a trial. Was there an objection at that time by the state that they needed more time than she had given them? She actually did give them more time. She originally said a more expedited schedule. They complained that they needed more time. What about the final amount of time they had? Did they continue to object that they needed more time than that? At the preliminary injunction hearing, no, they did not continue to object. They tried to delay it further, but they did not on different grounds. And in fact, I mean, on the one hand, they were saying, oh, we needed more time. But as soon as they reacted very quickly, they also said it was too late, that we were timed out. So clearly, they were using the time as a way of dragging their feet, but they were not prohibited from providing extensive expert testimony, which they said is the heart of the case, and they chose not to put on. The legislative record testimony, meanwhile, there's nothing preventing them from putting on those back witnesses, from the district court assessing their credibility, from allowing us the opportunity to cross-examine them. But putting in just statements from the legislative record is not the same as making a trial record. And here, the trial record is clear that the communities of interest established by the plaintiffs between Baton Rouge and the Delta parishes, including not just from back witness testimony, but also from expert witness testimony. Mr. Fairfax made clear that those community risk factors that he looked at were very common between the Delta parishes and Baton Rouge. And specifically, those are interests relating to socioeconomic conditions, to infrastructure, to environmental risk factors that make them more vulnerable in the event of an indigenous disaster, and then the accompanying interests that go along with that. The other important thing about the RULAC inquiry of compactness that I think is getting missed here. RULAC said that there were two reasons why the district, in that case, was not compact for purposes of Jingles 1. One is the failure on that record to show that there was common ties. That's obviously not this record, as I've just mentioned. But the other was the far-flung and vast nature of the district. There was a huge expanse covered by the district over 300 miles. Here, you just don't see that. If you look at the actual... on page 22, you will see the difference between the inactive map and the illustrative map when it comes to CD5. CD5 in the inactive map actually spans a greater distance all the way to the east coast of the state. And in fact, what that tells us is that the distances covered by CD5 in the illustrative map are clearly well within Louisiana's tradition of drawing districts. So I have to move you back to where you were until I interrupted. I just interrupted you again. But you were going through why Alabama, what was done over there is exactly the right procedure here. It seems to me that what happened over there after the Supreme Court's remand is useful to consider, but it is certainly not controlling on us. There was an actual holding by the Supreme Court that the Section 2 violation had been sufficiently shown, and that was affirmed in the remand. It does seem to me that with that holding, without any objection having been made in the briefing to the Supreme Court that perhaps more trial work needed to be done, I'm less convinced that that is a good road map for us for this one feature. And it's a little bit of what Judge Elroy was talking about earlier. I just see that the preliminary injunction factors are less urgent at this stage. I'm not sure that the states preserved the argument to us that they had insufficient time to present their case, and you went through some things to try to convince me that is correct, but maybe not. Isn't there time to do this in a more measured way and not to get to the stage even of saying, we've now made this holding legislature, you need to decide if you're going to act, but just to make a determination of whether Section 2 violation has been sufficiently shown. I don't see the PI factors in play anymore. Let me address both parts of the question. First on the Alabama issue, it is important to note that the Alabama case went up on a preliminary injunction, and what was affirmed by the U.S. Supreme Court was the preliminary injunction, in the same way that this Court has the opportunity to affirm their preliminary injunction. There is not a final judgment on the merits in Alabama. What I'm saying on the PI aspect, you're absolutely right, I asked the Court of Counsel exactly that, but it does seem to me that without the issue having been raised with the Supreme Court, we're in a somewhat different situation, and what do we do with it now? It's a mandatory PI that normally you would move ahead into the remedy section, and not have a trial on the merits. That was a decision made in 2022, leading up to the 2022 congressional elections, trying to get ready for that, and we're just in a different place now with more time. And you're actually in a very similar place as Alabama, which is now back on remand, or sorry, there's a preliminary injunction in place from the district court, has not been stayed, and in Alabama, the state of Alabama has insisted that they will go to trial, has told us on many occasions that there will be a trial. The state of Alabama has insisted that there will be a trial, because it is only on the preliminary injunction. However, they have recognized that the preliminary injunction, once it is affirmed, needs to be effectuated to ensure that the injuries don't nourish the plaintiffs in the next election, or the next election. So whenever that trial takes place, that does not undo the preliminary injunction. There is no argument there, and there's no reason to believe that the preliminary injunction is now kind of eviscerated away. When it comes to the equities of this case, Your Honor, to address the second part of your concern, those also have not evaporated simply because we have a little bit more time on the election calendar. The plaintiffs here should not be forced to play chicken with the election calendar, where all of a sudden last time, we brought it too quickly, but then it was too late for relief. And now here, we can't get the injunction to which we'd already won. We can't effectuate that, because now there's lots of time. But we are willing to run the risk of getting timed out once again. And respectfully, Your Honor mentioned that what if this court were to order the trial to take place? First of all, I'm not aware that the reason for dispensing with a PI is just because... That's not actually one of the legal bases for a PI. Once the PI factors have been met, I'm not sure that they just fall away, because there could be more time. Well, the equities don't favor, so that would be the factor that wouldn't exist. Except the equities that continue to favor are deemed... The only court to weigh in on the merits has deemed it to be an unlawful match. It has already been held, forced upon plaintiffs for one election, and that you force plaintiffs to kind of hurry up and wait and hope that we don't get timed out in the second election due to factors beyond our control. And respectfully, the Fifth Circuit panel last year said, go forward with the remedy. It did everything in its power to say, go forward with the remedy to ensure relief in time for the election and because of factors outside of its control. It also was... Plaintiffs were left to bear the burden of that injury. There's... Can we talk about Allen? Since you've been talking about it. The breaking up of the Gulf Coast region in that case was permissible because another community of interest was created. Is there a new community of interest that makes up for the divisions of Baton Rouge and Lafayette? Yes, absolutely. What is that? The community of interest is the community of interest that the plaintiffs identified between the Delta parishes and Baton Rouge. That's a new community of interest? I thought that community of interest already existed. Sorry, that's not a new community of interest, but in the same way that in Alabama, we argue that there is a community of interest between the rural Black Belt and the city of Mobile, and the state argued against us and said, no, we've got to keep the city together where there's other Bay Area issues. That's exactly what we're saying here. We have... Our plaintiffs have lived in this community and testified about this community, these shared interests, that has long existed along the Mississippi, between the Delta and its most major city in Baton Rouge, and that the legislature chose to prioritize their preferred communities does not render our community of interest null, and it certainly does not mean that our map does not respect all the different communities of interest just because they're different from the legislature. What do we do about the community of interest of the Acadian people, which is possibly substantially lessened? It was mentioned in the briefing by the other side. I didn't see it in your briefing. I didn't see it addressed in the district court's opinion. You know, obviously, that is a community of interest with its own language and culture. I don't think you're going to say it's not a community of interest. So what about the fact that that is substantially lessened by all of the illustrative maps? Actually, our expert report, Bill Cooper specifically mentioned the Acadian region, and he made, in one of his illustrative plans, made efforts to keep that as intact as possible. And ultimately, communities of interest in any state are overlapping and are subjective and do require some trade-offs. And so, certainly, if this court were to affirm the preliminary injunction, and if the legislature were to have an opportunity, and by the way, it's always had that opportunity to act with the legislature. It doesn't need anybody's permission for that. If the legislature wants to go back and draw a real remedy, it can consider any factors that it wants. It does not have to draw this illustrative map. It has to draw an opportunity district. And as we just learned from Alabama yesterday, contrary to their argument on a VRA remedy under JINGOS 3, the state or the court has the ability to draw any kind of district that remedies. That includes something that's fully... It would have a chance to go back and draw a map to take care of that if it chose to do so. Absolutely. As long as it provides that second opportunity. I'm sorry. Your time is drawing to a close, and I didn't get to ask a question about predominance. And I'm concerned the... Was Mr. Cooper's report the one that said, well, I didn't look at race constantly? Who is the one who said I didn't look at it constantly, and I went back and forth from looking at... I'm not entirely sure if that was Mr. Fairfax. Maybe it was Mr. Fairfax. But in any event, I can speak to the way Mr. Cooper looked at race just as he did in the Alabama case. He understood that race was part of a consideration for the question. JINGOS 1 is a demographic question. How large and how concentrated is the black population? And so when you're answering a demographic question and you ask a demographer to answer the demographic question to draw a map, of course he is aware of the demography that is part and parcel of the inquiry. But the question was not, can you draw any old district that provides majority black districts? Can you draw... The question was, can you draw one consistent with traditional districting principles, which requires the constant balancing and consideration of numerical, qualitative, community, compactness, parish splits, and a host of other criteria, all of which he testified to. Okay, my last question is, how do you distinguish Bethune Hill that says that race predominates when race-neutral factors come into play after the race-based decision has been made? And for what it's worth, Your Honor, I was also a counsel in Bethune Hill on the plaintiff's side there, and it is highly distinguishable because in that case the court made clear that the racial predominance inquiry cannot be based on a single metric alone but is a holistic inquiry, exactly like the one the district court applied here, which said even though there was, of course, understanding that we're in the jingles one concept of having to create an additional majority black district, as long as that is not done at the subordination of the other principles and is done in coordination with the other principles, then there is no racial predominance. That holistic inquiry here under Bethune Hill and under Cooper and all of the case lines, and certainly under all the Section 2 cases, shows that the district court got it right in this case. Ms. Connell, extension of your remarks a little bit further, were we to affirm the P.I., but have a concern that the district court might need to look at some of this further on Section 2 violation, not on what the map should look like. Were we to go that way, what would you propose is the right way to order that? I believe that if the court were to affirm the P.I., then the injunction, the act is not... Basically saying for purposes of the P.I., Section 2 violation was shown justifying whatever else would go into the analysis justifying the P.I. I prefer that to be, which I'm not saying it would be. But we do think that the state has raised some legitimate questions. It is making the P.I., one of the things that I'm not sure you have a response to, that Judge Edith Jones said in the mandamus order, is she called Chief Judge Dick's decision tentative, rushed and tentative, a word like rushed, maybe that's not what she said, wrote. So, is there a way to have Chief Judge Dick look at this further even if we're affirming the P.I.? Absolutely, Your Honor. I think the natural course of the litigation would be just that. A preliminary injunction is preliminary, to be clear. A 150-page opinion is not certainly light. There's a deep and thorough analysis after a well-litigated hearing. But it is a preliminary injunction. It does entitle the parties to continue to move forward to trial. Absolutely, the court could do, could affirm... Absolutely. So, I think the next steps and ones that we have offered are affirming the preliminary injunction, effectuating the preliminary injunction with a remedial map to ensure that there is a map that doesn't dilute voting strength in place come hell or high water, that plaintiffs are not left holding the bag if we end up getting timed out again, and then proceeding very immediately and as soon as the court enables, because certainly the plaintiffs are able, proceeding to trial on the merits, and if that trial on the merits is able to be resolved and remedied in time, there's no reason why that wouldn't supersede the preliminary injunction. The preliminary injunction, however, needs to be in place to kind of freeze the equities which have, which should endure to plaintiff's favor according to the findings, and then allow the trial to proceed. Defendants will not be harmed if the trial does proceed and if they prevail. The preliminary injunction map will not go into effect. Rather than doing it in that order, if you were, assuming arguendo, you were affirmed, could you say, District Court, you need to effectuate, allow the trial, Louisiana, because your co-counsel already said Louisiana should get a choice and give them six weeks or whatever the time would be, and in that, and then also simultaneously say the trial on the merits needs to be done by the end of the year or by January 15th. I think absolutely, Your Honor. I think that, well, I think that regardless of how much time the legislature has provided, there can be a remedial map in place to effectuate the preliminary injunction simultaneous with the trial on the merits taking place. They could be working on the remedial map while the trial on the merits is proceeding. Absolutely, and the District Court is able to adjudicate the remedial map while the trial on the merits is proceeding, so that no matter what, there is going to be some remedy unless the final trial on the merits shows that the plaintiffs do not prevail. Because otherwise, you delay the trial waiting for the remedial stage, and I don't think that the plaintiffs favor that either. Absolutely not, and there's no reason why they have to be sequential. They can go, this can all happen on the same timeline, but the point of the preliminary injunction is to freeze in place the equity so that when the next election comes, and be very clear, it is fall before the next election. In Alabama, we brought that preliminary injunction in fall before the next election, and we were told we were timed out. In Louisiana, we brought the preliminary injunction the day that the map was enacted, and then as quickly as we could, and we were told we were timed out. So regardless of our efforts to move as quickly as possible, we need to finally get the relief to which we're entitled based on this extensive opinion that says that we are likely to be injured. If I might just say, Madam Presiding Judge, we have a fairly large audience here. Questions from the bench are not necessarily an indication of our thinking. We are probing each side and giving our best shot at seeing how they can respond. What we're going to decide is very much to be decided. Right. This is assuming arguendo all of the questions today. This is our only chance to visit with the very learned counsel on both sides, and so we have to probe it from if this, then then, but it doesn't mean that the this is happening.  I have no idea, but if you think so. I appreciate the opportunity and happy to answer any more questions. I know I've been over time. Thank you. Thank you. And you were over time, and so you can have two extra minutes. Thank you, Your Honor. I think I'll be taking all of our rebuttal time. I want to go back to some questions, Judge Elrod, that you asked. I want to be clear. The state's objections are not just to the combination of the Delta parishes with East Baton Rouge. Our concern about this case from the beginning has been the need for the plaintiffs in order to establish their Jingles 1 argument to surgical division of every city in the eastern two-thirds of the state along racial residential lines. It's the Delta parishes which are held together. It's the division of Monroe. It's the division of Alexandria. It's the division of Lafayette. It's the division of East Baton Rouge. The state sever East Baton Rouge and put it in whatever that number district is? East Baton Rouge is currently divided in the existing majority minority district. It is divided. The legislature already has split that one urban area. That's right. But the other cities, Monroe, Alexandria, Louisiana, sorry, not Louisiana, Lafayette are all held together. And I think that that's important to understand. This panel has had a lot of questions about the Alabama case and I think it's really important to understand the factual differences about the population distributions in Louisiana and Alabama. In Alabama, there are 11 majority black parishes that all, sorry, counties that all border each other. In Louisiana, there are seven majority black parishes. Three of them touch each other and those are the Delta parishes up in northeast Louisiana. The other four don't touch each other. And so, you know, where I think the three most northern parishes in the Delta. Yes, I think they have a total of about 30,000 people which is like 10% of a congressional. Did Alabama not have these bridges that you're, because they don't touch each other? So in Alabama, you have the kind of the black belt in the west central part of the state and, you know, and there's substantial black population that's more or less contiguous over to Montgomery and up to Birmingham. And then there is a finger drawn in the remedial map down into Mobile. But the point is the Alabama population configuration is much more compact than here. And if you look at what the court said in, what the Alabama court said, they were more focused on unifying divided cities in Alabama, right? One of the criticisms that they had was the division of Montgomery into two districts. Guess what? Montgomery's been unified in the new map, right? And why is that? And it's because, you know, which is the opposite of what we have here. Here, the plaintiffs are urging this court to allow every city in the eastern two-thirds of the state to be divided on racial residential lines between congressional districts. And we pointed, you know, we had experts below in front of the preliminary injunction that pointed that out. We had Alan Murray, an expert in spatial demographics, pointing out that the minority populations are, while they are concentrated, are, kind of, distinct from each other. And Judge Dick even acknowledged that in her opinion when she said, you know, there are pockets of minority community that can be linked together. But the whole point of Jingles 1 and the examination of the compactness of the minority community that Justice Kavanaugh stressed in his concurrence in the Alabama decision was really the focus on the compactness of the minority population. And I think the difference that we have in Louisiana versus Alabama is that the minority population in Louisiana is just not geographically compact like it is in Alabama. And I think that... This is a matter of law, though, or is it because if the district court said, I acknowledge that this isn't terrific for this reason, but it's the best we can do, is that subject to the clear error? Um, factual determinations are subject to clear error, of course, but this court gets to the conclusions of law that you draw from that, this court gets the NOVO review on. And I think determining that a community is geographically compact when you have to combine part of Lafayette, part of Alexandria, part of Monroe, part of Baton Rouge, and the Delta parishes all together through, as Mr. Schmack described, white land bridges is a legal conclusion drawn from the facts that this court can look at the NOVO. Where is the defect? It seems to be... It may not be in one of the three preconditions on how you're saying that urban areas have been split. Is it a fact that one of the preconditions has been satisfied or that you cannot create an appropriate district even if the preconditions are satisfied? Well, I think there's a couple things. You know, there was a lot of discussion in Allen, in the decision in Allen about proportionality. And if you look at Judge Dick's opinion, the notion of proportionality and the notion that somehow it's fair because black population is about a third of the state that there should be about a third of the state that black majority districts pervade. It's how the district court opens. It's throughout the district court's analysis and it's how it concludes. And if you look at Allen, the Supreme Court said proportionality should not be the guiding light here and this district court turned proportionality into a guiding light. The Little Act says that once you get past the three preconditions, proportionality is part of the totality of the circumstances. And the opinion that a presiding judge was citing a little while ago picked up on that as well. I don't know what the name of it is. So isn't that true or am I misreading the, I'm sorry, doesn't Little Act say that that's part of totality? So I guess it's, I mean really it's a problematic, it's the very thing that the Supreme Court says we're not doing but then it becomes a factor on totality. The text of section two itself says this does not entitle anyone to proportional districts, right? And so I think that that's clear and I think that that sort of proportionality notion really did play a very large role in what the district court ordered here. And that's part of the reason we think it should be reversed. Are you going to tell us by when you would need the information? Yes. I consulted with my co-counsel. Ideally going about six weeks out from the mid-July filing deadline, the secretary would ideally like to have a map in place and know what map is going to be used in 2024 by late May. Late May answer, May 30th? About that, about six weeks back from the qualifying deadline that started in mid-July. Joseph, if you asked about whether we raised the rush timing, I would point you to our June 21st, 22nd brief pages 15 to 23 where we talked about the rush  Is that in your facts section? Yes. It is in your facts section, but you don't make... That's right, Your Honor, but I think we were bringing it to the court's attention in that section. You're right to point it out. Good work, counsel, but still not making it an issue. Right. And just to give another example of how that issue was raised, I think it's important to point out that we didn't have the opportunity to create a fulsome record at a trial that we would normally have been entitled to if we were proceeding to a trial on the merits. It was literally... Otherwise, I mean, a lot of other things go into it, but it seems to me that might lend support to affirming the P.I., but just saying these sorts of issues can be dealt with at a later trial where you won't have Zoom problems, maybe. But, Your Honor, I think that that's a good   it's important to have a trial and to allow this court, albeit on an expedited basis, to review whatever it is Judge Duke does after a trial. And so what did you think about the schedule that if you were to lose that the court would be remanded for the state to have an opportunity to draw its maps and simultaneously for the trial to take place on the merits? Your Honor, I think one thing I would like this court to consider in any schedule that it sets out is that the state statewide offices are up for trial. So we're going to have a significant change in state leadership. I don't think there's a single statewide executive official who's running for reelection to that particular office. But you can't have your cake and eat it too. We need a trial on the merits, but we have to put that off. February 15th would work out a little bit better for us. That way the new officials who are taking office in January will be able to play an effective role in determining exactly how the state proceeds to trial versus February 15th to complete a trial. Because if we do a January 15th trial, I think the new statewide elected officials take office January 9th. So to tell them that they have to complete a trial that's going to start six days after they take office, I think there's a lot to ask. Again, this is not foreshadowing. It's just trying to figure out what the logistics are. I think your time is up, so you need to wrap it up. We appreciate all the arguments today, and this case is submitted. This court will stand adjourned pursuant to the usual order.